JAHNA LINDEMUTH
ATTORNEY GENERAL

SEAN P. LYNCH
ASSISTANT ATTORNEY GENERAL
Office of the Attorney General
P.O. Box 110300
Juneau, Alaska 99811-0300
Ph: (907) 465-3600
sean.lynch@alaska.gov
Attorney for the State of Alaska

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

STATE OF ALASKA,          )
                              )
         Plaintiff,      )     Case No. 1:16-cv-00018 (RRB)
                              )
     v.                 )
                              )     **PLAINTIFF'S PRINCIPAL BRIEF**
UNITED STATES FOREST SERVICE  )     **IN SUPPORT OF MOTION FOR**
and DAVID SCHMID, in his      )     **SUMMARY JUDGMENT**
official capacity as Acting     )     (Civil Rule 56(a); Local Rule 16.3)
Regional Forester,         )
         Defendants.   )     Hon. Ralph R. Beistline
_____)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION ........................................................................................... 1

FACTUAL BACKGROUND ............................................................................ 2

    I.     Development of Federal Legislation that Became Section 4407 ................. 2

    II.    Development of 4407 MOU to Implement Reciprocal Exchange ............... 7

    III.   Development of D-1 Highway Planning Easements .................................. 10

    IV.   Revising Shelter Cove Road D-1 Easement ............................................. 12

    V.    Differing Assumptions and Interpretations of the 4407 MOU ................. 15

STANDARD OF REVIEW .............................................................................. 20

ARGUMENTS ................................................................................................ 22

    I.     Interpretation of Fixed Easement is Arbitrary and Capricious
         (First Cause of Action) ............................................................................. 22

    II.    Interpretation of Discretionary Decision is Arbitrary and Capricious
         (Second Cause of Action) ......................................................................... 29

    III.   Adding NEPA Requirement to D-2 Easement is Contrary to Law
         (Third Cause of Action) ........................................................................... 33

    IV.   Decision to Deny D-2 Easement is Arbitrary and Capricious
         (Fourth Cause of Action) .......................................................................... 37

CONCLUSION ............................................................................................... 37

SOA v. USFS and David Schmid          Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT     ii
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 2 of 43

# TABLE OF AUTHORITIES

## CASES

*Alaska v. United States,*
    546 U.S. 413, 126 S.Ct. 1014 (2006) ........................................................ 3

*Andrus v. Charlestone Stone Products Co.,*
    436 U.S. 604, 98 S.Ct. 2002 (1978) ........................................................ 23

*Atchison, Topeka & Santa Fe Ry. v. Wichita Bd. of Trade,*
    412 U.S. 800, 93 S.Ct. 2367 (1973) ........................................................ 22

*Burlington Truck Lines v. United States,*
    371 U.S. 156, 83 S.Ct. 239 (1962) ......................................................... 21

*City & County of San Francisco v. United States,*
    130 F.3d 873 (9th Cir. 1997) ................................................................... 21

*Ctr. for Biological Diversity v. Nat'l Highway Transp. Safety Auth.,*
    538 F.3d 1172 (9th Cir. 2008) ................................................................. 21

*Dillingham Commercial Co., Inc. v. City of Dillingham,*
    705 P.2d 410 (Alaska 1985) .................................................................... 24

*FCC v. Fox Television Stations,*
    556 U.S. 502, 129 S.Ct. 1800 (2009) ...................................................... 22

*Great Northern Ry. Co. v. United States,*
    315 U.S. 262, 62 S.Ct. 529 (1942) ......................................................... 31

*Leo Sheep Co., v. United States,*
    440 U.S. 668, 99 S.Ct. 1403 (1979) .......................................... 23, 24, 28

*Marvin M. Brandt Revocable Trust v. United States,*
    527 U.S. 93, 134 S.Ct. 1257 (2014) ....................................................... 31

*Montana Wilderness Ass'n v. U.S. Forest Service,*
    496 F.Supp. 880 (D. Mont. 1980) ........................................................... 33

*Montana Wilderness Ass'n v. U.S. Forest Service,*
    655 F.2d 951 (9th Cir. 1981) ................................................................... 33

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29, 103 S.Ct. 2856 (1983) ........................................................ 21

*Noble v. Union River Logging R. Co.*,
    147 U.S. 165, 13 S.Ct. 271 (1893) .......................................................... 31

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*,
    477 F.3d 668 (9th Cir. 2007) ................................................................. 22

*Oregon Natural Resources Council v. Thomas*,
    92 F.3d 792 (9th Cir. 1996) ................................................................... 34

*Organized Village of Kake v. United States Department of Agriculture*,
    795 F.3d 956 (9th Cir. 2015) .............................................................. 3, 22

*Racine v. United States*,
    858 F.2d 506 (9th Cir. 1988) ................................................................. 30

*SEC v. Chenery Corp.*,
    332 U.S. 194, 67 S.Ct. 1575 (1947) ...................................................... 21

*Shultz v. Department of Army*,
    10 F.3d 649 (9th Cir. 1993) ................................................................... 24

*Shultz v. Department of Army*,
    96 F.3d 1222 (9th Cir. 1996) ................................................................. 24

*United States v. Denver & Rio Grande R. Co.*,
    150 U.S. 1, 14 S.Ct. 11 (1893) ............................................................. 23

## STATUTES

5 U.S.C. § 706 ................................................................................................ 21

23 U.S.C. § 139 .............................................................................................. 26

23 U.S.C. § 317 .......................................................................................... 4, 26

43 U.S.C. § 932 .............................................................................................. 24

43 U.S.C. §§ 934-937 ..................................................................................... 31

43 U.S.C. § 1301 .............................................................................................. 3

SOA v. USFS and David Schmid           Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT      iv
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 4 of 43

## REGULATIONS

23 C.F.R. § 1.23...................................................................................... 25, 36

23 C.F.R. § 710.403.................................................................................... 36

23 C.F.R. § 771.111(f)................................................................................. 26

36 C.F.R. § 294.......................................................................................... 3

40 C.F.R. § 230.10(a).................................................................................. 32

## LEGISLATIVE HISTORY

HR 22 Engrossed Amendment Senate,
    2015 CONG US HR 22, Section 14001(q) ...................................... 18, 35

Senate Report 114-80,
    2015 WL 4384695 ................................................................. 18, 26, 35

SOA v. USFS and David Schmid           Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT    v
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 5 of 43

# INTRODUCTION

On March 21, 2014, the United States Forest Service ("the Forest Service") announced a new interpretation of the scope and requirements of the transportation and utility easements established by Section 4407[1], which would make development of the State's infrastructure projects in Southeast Alaska nearly impossible. The Forest Service's announcement came a full a decade after the Parties began working on the exchange of easements to enable the Shelter Cove Road project, and two full years after the Parties confirmed their common understanding of the scope and requirements of the 4407 easements. The Forest Service implemented this new interpretation through its March 21, 2016 final agency action of issuing a special use permit that effectively denied the State's request for its congressionally granted 4407 easement. The Forest Service's refusal to issue a 4407 easement for the project occurred just one month after a congressional committee considered the matter and passed a bill clarifying Section 4407, and occurred a mere two days after that same committee issued a report stating that the intent of the amendment was to allow the transfer of 4407 easements without further delay.

Relying on the Forest Service's assurances of a future transfer of a 4407 easement, the State spent millions of dollars in public funds to acquire non-federal land to avoid sensitive National Forest System resources and to site the road in a location with the least

---

[1]     Section 4407 of the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU"), Public Law 109-59 § 4407 (119 Stat. 1144, 1777).

*SOA v. USFS and David Schmid*                               Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 1 of 38

environmental impact. Yet, under the Forest Service's new interpretation that 4407 easements could only be issued for facilities at a fixed location—with greater environmental impacts—the Forest Service denied the State's request for the project's 4407 easement. The Forest Service's new interpretation and their withholding of the 4407 easement denied the State the benefit of its bargained for reciprocal exchange of easements, making it nearly impossible that the State could connect the communities of southeast Alaska with transportation and utility infrastructure. The State seeks the final judgment and order in this case that will preserve its congressionally granted property rights and ensure the delivery of infrastructure projects across the Tongass National Forest for the benefit of the people of Alaska.

## FACTUAL BACKGROUND

### I. Development of Federal Legislation that Became Section 4407.

In the early 2000s, the State and Forest Service were each confronted with pending changes to ownership and classification of lands in southeast Alaska that could severely impair the public's access across the intermingled state and federal properties. The Forest Service faced the predicament that the submerged lands underlying hundreds of federal facilities that provide public access to the Tongass National Forest—docks, floats, boat ramps, breakwaters, log transfer facilities and other similar improvements—were destined to be transferred to the State of Alaska through the State's submerged lands

*SOA v. USFS and David Schmid*                    Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 2 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 7 of 43

quiet title action.[2]  The State faced a similarly dire situation with the Forest Service's

Roadless Rule potentially preventing the construction of roads and utilities in the Tongass

National Forest, which were necessary to link and develop southeast Alaska

communities.[3]  It was in this context that the State and Forest Service began discussing a

congressionally ratified exchange of easements to permanently resolve these public

access issues.[4]

In early 2004, the Parties completed their proposed legislation to effect the

easement exchange, and each delivered the proposal to Alaska's congressional

delegation.[5]  The initial version of the legislative proposal provides insights on essential

terms of the Parties' agreement that shaped the development of the memorandum of

understanding to implement the exchange.  In particular:

- All actions to effectuate the exchange of easements are exempted from the
  requirements of the National Environmental Policy Act (NEPA);[6]

---

[2]    *See Alaska v. United States*, 546 U.S. 413, 126 S.Ct. 1014 (2006) for a timeline of
the action to quiet title to formerly federal submerged lands in southeast Alaska pursuant
to the Submerged Lands Act, 43 U.S.C. § 1301, *et seq.*

[3]    *See Organized Village of Kake v. United States Department of Agriculture*, 795
F.3d 956 (9th Cir. 2015) (en banc) for southeast Alaska's history of the Roadless Area
Conservation Rule, 66 Fed. Reg. 3244 (January 12, 2001), 36 C.F.R. § 294.

[4]    State of Alaska's supplement to the Administrative Record ("SOA") document
number SOA 1 at Bates numbered page 0001 ("[We] will involve all of the Corridors and
other Lands contemplated by both the USFS and the State of Alaska in resolving this
submerged lands/access issue.")

[5]    SOA 105 at 0649-0653 (State of Alaska's January 30, 2004 bill transmittal) and
SOA 105 654-656 (Forest Service's January 28, 2004 bill transmittal).

[6]    SOA 105 at 0652, § 2(a) ("No action of the Secretary or the State of Alaska to
effectuate the grants of land interests authorized herein, including any amendment to the
forest plan, shall be deemed a major federal action significantly affecting the quality of
the human environment for the purposes of [NEPA]").

*SOA v. USFS and David Schmid*                                    Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 3 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 8 of 43

- The easements provided to the State of Alaska would be consistent with the easements granted, pursuant to 23 U.S.C. § 317, for federal-aid highway projects that traverse federal lands;[7]

- The rights-of-way for transportation corridors and marine facilities proposed for exchange are identified on a single map of southeast Alaska.[8]

Along with the Parties' proposed legislation, the Parties also provided a copy of a map to the Alaska congressional delegation that identified the general locations of facilities requiring easements.[9] The map was prepared by the Forest Service's Alaska Region and finalized on December 22, 2004.[10] The 2004 map's identification of southeast Alaska's "Existing Road or Highway" (depicted with red lines) and "Proposed Transportation and Utility Corridor" (depicted with yellow lines) were primarily drawn from the "Existing State Road Corridors" and "Proposed State Road Corridors" identified in the 1997 Tongass National Forest Land and Resource Management Plan ("Forest

---

[7] SOA 105 at 0651 § 1(b) ("Said easements shall be in the form and style currently used by the United States Department of Transportation to States for Highway purposes, containing no additional constraints or restrictions from those issued to other States for the purpose of permitting public highways and roads").

[8] SOA 105 at 0653 § 3(a) ("The rights-of-way and easements that may be granted to the United States by the State of Alaska and the rights-of-way and easements that may be granted to the State of Alaska by the United States pursuant to Section 1(a) are identified on the map entitled "Transfer Facilities, Marine Access Points and Proposed Transportation Corridors in Southeast Alaska" dated January x, 2004.").

[9] SOA 105 at 0649 ("The enclosed map identifies those [easement] needs which, if resolved, would be of great benefit."); *see also* SOA 105 at 656 ("The rights-of-way and easements … are identified on the map entitled "Transfer Facilities, Marine Access Points and Proposed Transportation Corridors in Southeast Alaska" dated January 22, 2004.").

[10] Forest Service Administrative Record ("AR") Document numbered 176 ("Prepared January 22, 2004 by USDA Forest Service Region 10, Geometronics.").

*SOA v. USFS and David Schmid*                    Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 4 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 9 of 43

Plan").[11]  There were two prominent additional transportation and utility corridors in the

Parties 2004 map: A proposed road corridor is depicted between Kake and Petersburg

where the 1997 map depicted no road corridor but rather a "Potential Power

Transmission Corridor."[12] Additionally, a corridor is depicted between the Bradfield

Canal and the Canadian Border to further one of the State's primary goals for the

proposed easement exchange: to develop the Bradfield Corridor with a road and electrical

transmission line linking Ketchikan to the Canadian border.[13] The State's Shelter Cove

Road project is located in the southernmost leg of the Bradfield Corridor.[14]  Quite

importantly, for the depiction of all of these proposed transportation and utility corridors,

the 2004 map's legend quite prominently expresses the intent of the Parties that the map

only shows approximate locations of the easements intended for exchange, and the map

should not be used for the creation of legal descriptions for any particular easement.[15]

In the summer of 2005, when the then pending transportation bill was in

conference committee, Representative Don Young and staff for the House Committee on

---

[11]     *Compare* AR 176 and Exhibit A (1997 Forest Plan Map).  The 1997 Forest Plan
may be found at AR 740_001444; however, the map of the Forest Plan's land use
designations, which depicts the State's transportation and utility corridors, was not
provided in the administrative record.  A motion to take judicial notice of the 1997 Forest
Plan's map accompanies the State's motion for summary judgment.
[12]     *Id*.
[13]     *Id*., *See also* SOA 1 at 0001 ("The Bradfield is one of the Governor's top two road
priorities in S/E [southeast Alaska]"); Complaint ¶ 13 and Answer ¶ 13.
[14]     AR 178 (Map depicting entire Bradfield Corridor); *See also* SOA 2-1 at 0018
(proposing phased road projects from Ketchikan to Shelter Cove and from Shelter Cove
to Bradfield).
[15]     AR 176 ("Disclaimer: Boundaries and locations are approximate.  This map
should not be used or interpreted for legal or administrative actions.").

*SOA v. USFS and David Schmid*                              Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 5 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 10 of 43

Transportation and Infrastructure began detailed consideration of the Parties' proposed legislation to effect the easement exchange. In an iterative drafting process, the Parties incrementally pared the proposal down to a page and then to a long paragraph.[16] Each of the Parties' proposals retained the NEPA exemption, and the identification of the easements on an associated map, but each iteration of the proposed legislation would also require a condition precedent: the Secretary of Agriculture was required to approve agreements between the Parties to effectuate the grants of reciprocal rights-of-way identified on the map.[17] The congressional committee removed the condition precedent to create the final language of Section 4407: "Notwithstanding any other provision of law, the reciprocal rights-of-way and easements identified on map numbered 92337 and dated June 15, 2005, are hereby enacted into law."[18] Only the caption of the Parties' December 22, 2004 map was modified when it became the map numbered 92337 dated June 15, 2005 ("Map 92337") by replacing the statement of Forest Service authorship with a statement of State adoption, and by removing the Parties' disclaimer noting the inaccuracy of the map locations.[19] The reciprocally exchanged easements through, and

---

[16]    SOA 95 though SOA 98.

[17]    *Id.* (*See e.g.,* SOA 98, "The United States, acting through the Secretary of Agriculture, shall approve any agreement presented by November 30, 2005, that is entered between the United States Forest Service and the State of Alaska and that grants the reciprocal rights-of-way and easements identified on the map entitled 'Transfer Facilities, Marine Access Points and proposed Transportation Corridors in Southeast Alaska,' dated June 15, 2005.")

[18]    Public Law 109-59 § 4407 (119 Stat. 1144, 1777).

[19]    *Compare* AR 178 (Map dated June 15, 2005) with AR 176 (Map dated December 22, 2004).

*SOA v. USFS and David Schmid*                    Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 6 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 11 of 43

along the coastline providing access to, the Tongass National Forest were established on

August 10, 2005 when President George W. Bush signed SAFETEA-LU into law.

## II.    Development of the 4407 MOU to Implement Reciprocal Exchange.

In February 2006, the Parties began drafting the memorandum of understanding

("the 4407 MOU") for the stated purpose "to establish a framework and process for

granting the reciprocal rights-of-way and easements described in Section 4407."[20]  The

4407 MOU's opening paragraphs, which encapsulate the Parties' intent, remained

unaltered through the drafting process.[21]  The methods for transferring easement rights

for the three categories of facilities also remained mostly unaltered throughout the 4407

MOU drafting.  In sum, the State agreed to interpret a state land use regulation in a

manner to immediately and fully authorize the Forest Service to construct, operate and

maintain the 231 docks, floats, boat ramps, breakwaters, and other coastal facilities

identified as marine access points ("MAP") on Map 92337; if the State subsequently

changed the regulation or otherwise restricted access, the State agreed to issue individual

easements for each of the MAPs.[22] The State also agreed to issue individual easements of

approximately ten acres for each of the 126 log transfer facilities upon the Forest

Service's delivery of a recordable survey of each facility and in accordance with the

terms and conditions of the form easement negotiated by the Parties.[23]

---

[20]     SOA 8-1 at 0029.
[21]     *Compare* "Statement of Purpose" and "Statement of Mutual Interest and Benefits" in SOA 8-1 at 0029 (February 23, 2006) and AR 1 at 0001 (September 29, 2006).
[22]     *Compare* SOA 8-1 at 0031 and AR 1 at 0004 - 0005.
[23]     SOA 8-1 at 0030 - 0031 and AR 1 at 0003 - 0004.

*SOA v. USFS and David Schmid*                    Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 7 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 12 of 43

Developing the two-stage process to properly locate highway facilities and easements took more drafting work and effort. The initial draft of the 4407 MOU recognized that the State would receive an easement that would satisfy the regulatory requirements for federal-aid highway projects connecting the communities of southeast Alaska.[24] While the ultimate goal of constructing and operating highways through the identified corridors was laudable, the Forest Service's initial draft provided no mechanism or authorization for the State to perform environmental studies and engineering to determine the precise location of a proposed road. To remedy the deficiency, the State introduced the concept of an immediately recorded "floating easement" that would identify a wide corridor for highway planning activities and that would be replaced by the narrow highway easement upon construction.[25] To put the concept into effect, the State proposed that:

> We can identify the land over which the easement goes by section, township, range and meridian. We can call out the alignment through 92337, starting and ending point, and approximate width and location. Finally, we can specify a means for exact location, a survey, which needs to be done anyway before construction can begin.[26]

---

[24]   SOA 8-1 at 0030 ("The Forest Service shall grant to the State rights-of-way sufficient to satisfy the requirements of 23 U.S.C. [sic] § 1.23 for the construction, operation, and maintenance of roads, utilities, and other linear transportation and utility purposes, for each route identified on the Map.")

[25]   SOA 107 at 0667 ("One of the basic ideas of this agreement is to lock into place an easement protecting transportation corridors from the whims of future administrations. Initially, we had suggested 'floating easements.' By their nature, they are not defined until final construction, and we could even say that they terminate without work being completed within a certain time. But, by at least recording the floating easement now, we will have protected ourselves from changes in future administrations.")

[26]   SOA 108 at 0668.

*SOA v. USFS and David Schmid*                    Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT                    Page 8 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 13 of 43

The State also proposed language for the 4407 MOU's paragraph D(1) requiring the recorded highway planning easement ("D-1 easement") to allow the State access for engineering and environmental planning activities anywhere within the square-mile sections described in each recorded easement:

> The location of the rights-of-way will be as set forth in the map numbered 92337, dated June 15, 2005. (Attachment A [of the MOU]) This Map is intended, in part, to identify the servient estate. Attachment B [the D-1 easement] will identify the section, township, range and meridian designation of the servient estate, and will include a starting point, ending point, and approximate width and alignment of each right-of-way corridor. [27]

Paragraph D(1) goes on to require that the location of the 300-foot-wide easement for construction and operation of the transportation facility ("D-2 easement") will be based on a surveyed plans developed through the engineering and environmental permitting activities authorized under the D-1 easement:

> The location of the right-of-way will be further detailed by a survey diagram or diagrams at times and places mutually agreed by the parties and such survey diagram will be prepared during the course of activities described above [engineering activities and environmental review processes], but prior to construction (see D(2)).[28]

Once the Parties formalized the two-stage framework and process for determining the location of future highway facilities, with the floating easement concept in the 4407 MOU's paragraph D(1), and the fixed location easement for construction and operation of the infrastructure in paragraph D(2), the only remaining hurdle for the preparation and

---

[27]     SOA 108 at 0670; *See also* SOA 14-1 at 0079.
[28]     SOA 108 at 0670; *See also* SOA 14-1 at 0079.

*SOA v. USFS and David Schmid*                    Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 9 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 14 of 43

transfer of the highway planning easements was the Parties' selection of the square-mile sections for the individual D-1 easement descriptions.[29]

## III.  Development of D-1 Highway Planning Easements.

The inherent flexibility of the Parties' floating easement concept was in full display in the development of the D-1 easement property descriptions to allow planning activities in each of the Bradfield Corridor segments.  The 4407 MOU's agreed upon D-1 planning easement restricts the potential effects of the State's environmental sampling and engineering surveying activities by authorizing the State's use of an area approximately 300 feet wide located anywhere within the square-mile sections listed in each easement;[30] the outer boundaries of the D-1 easement area are described by the quadrangle sections identified in the easement's property description.[31]  Where the Parties agreed that additional flexibility was needed for environmental and engineering investigations of alternate routes to complete the corridor identified on Map 92337, the Parties drafted the narrative property descriptions in D1 easements to include the

---

[29]     SOA 15 at 0086 ("D(1) Easement. You provided a copy of the proposed D(1) Easement on April 25 [SOA 13 and SOA 13-1].  The only major issue is the description of the easement, and that goes back to the language I proposed in the MOU [SOA 108 at 0670]").

[30]     AR 1 at 0010 (4407 MOU's D-1 easement form)("… a right-of-way easement of approximately 300 feet in width … for highway and utility planning purposes, including the right to conduct engineering and other activities necessary or incident to highway and utility planning, design and environmental review processes, along, over and across the following described lands … based on protracted Sections, Townships (T), and Ranges (R)").

[31]     *See e.g.,* SOA 45-2 at 0382-0383 (Shelter Cove Road D-1 easement property description).

*SOA v. USFS and David Schmid*                    Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 10 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 15 of 43

common boundaries of adjacent square-mile sections.[32]  Additional planning flexibility

was provided in the Ketchikan to Shelter Cove D-1 easement by locating the planning

corridor along an alignment farther to the north than the proposed transportation corridor

depicted on Map 92337.[33]  The alignment chosen for Shelter Cove Road's 2009 D-1

easement was based on reconnaissance surveys developed by the State that found the

alignment to be one of two promising corridors for road development.[34]  The chosen

highway planning alignment is depicted in the 1997 Forest Plan map and the 2008 Forest

Plan map as an "Existing Power Transmission Corridor;"[35] however, the State's 2008

reconnaissance survey, that showed the suitability of the alignment for highway purposes,

was not available to Parties in 2004 when they prepared the map to accompany their

easement exchange legislation.

---

[32]      *See e.g.*, SOA 34 at 0306 ("Eagle to Bradfield[;] I added an additional section to
try to pick up Duck Point.  Thought it may be a good place for a ferry term[inal] since
building a road along Bradfield Canal is not practical.  Planning wanted to try and add
routes around both sides of Eagle Lake."); *See also* SOA 34-1 at 307-308 (editing the
Bradfield Canal D1 easement property description to add quadrangle sections by
including common boundaries).

[33]      SOA 34 ("Shelter Cove[:] After talking with planning they have an alignment they
wanted to use for Shelter Cove.  I added the Sections to the description [*See* SOA 34-3 at
315].  I also attached a map showing the route highlighted in pink [*See* SOA 34-4].  Take
a look and see if you are okay with what we are showing.").

[34]      *Compare* AR 740_1448 at 049154 (2009 D-1 easement map) with SOA 34-4
(2008 reconnaissance map).

[35]      Exhibit A (1997 Forest Plan Map) and Exhibit B (2008 Forest Plan Map).  The
2008 Forest Plan may be found at AR 1443; however, the map of the plan's
transportation and utility corridors was not provided in the administrative record.  A
motion to take judicial notice of the 2008 Forest Plan's map accompanies the State's
motion for summary judgment.

*SOA v. USFS and David Schmid*                                    Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 11 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 16 of 43

The Bradfield Corridor was certainly not the only place where the Parties included additional quadrangle sections in the D-1 easement descriptions in order to accommodate the lack of detailed information on Map 92337's depicted transportation corridors.[36] The overarching inaccuracies and lack of detailed data from Map 92337 was particularly noted by the Forest Service's lead representative on the 4407 easement exchange: "I continue to chuckle with the light magenta lines where the [existing] road are placed on the map [92337] scarcely matching the line work for the GIS display on the [D-1] easement diagram. But for a D-1 planning easement, I can live with the lack of precision and accuracy."[37] The resulting D-1 easement descriptions provided access to a sufficiently wide swath through the Tongass National Forest "to allow placement of a highway or utility in a manner that helps minimize environmental impacts and maximizes constructability."[38]

## IV.    Revising Shelter Cove Road D-1 Easement.

By early 2012, the State and the Forest Service saw the wisdom of shifting the Shelter Cove Road alignment from the "high" highway route identified on the State's 2008 reconnaissance map, which became the route of the 2009 D-1 easement, to the other feasible highway route on the 2008 reconnaissance map—the "low" route, which was

---

[36]    *See e.g.*, SOA 35 ("Rodman has a handful of changes where we moved the alignment around other lands and added some common corners for future wiggle room."); SOA 35-4 at 3257-328 (edits to Rodman Bay D-1 easement property description).
[37]    SOA 42 at 0369.
[38]    SOA 45 at 0380; *and Compare* SOA 45-1 (Boundaries of area authorized for Shelter Cove Road planning activities) with SOA 45-2 at 0386 (Shelter Cove Road D-1 Easement Map).

*SOA v. USFS and David Schmid*                    Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT        Page 12 of 38

added as a "Proposed State Road Corridor" in the 2008 Forest Plan.[39]  Development of

the high route identified in the 2009 D-1 easement would have required over four miles

of pioneer road construction in the National Forest, with half of that distance through

protected old growth forest located in the congressionally designated Naha LUD II

Management Area.[40]  Whereas, developing the low route would only require new road

construction on a single mile of National Forest System land, to be located within two of

the square-mile sections identified in the 2009 D-1 easement, namely Sections 8 and 17

of Township 73, and Range 92, located south and east of the Cooper River Meridian

("Sections 8 and 17").[41]  The low route also presented far fewer potential environmental

impacts and far better terrain for construction and operation of the State road, though

selection of the low route would require the acquisition of 9.5 miles of right-of-way from

private owners.[42]

Prior to spending public funds to re-route the proposed road away from sensitive

National Forest System resources, the State met with the Forest Service's Tongass Forest

Supervisor to confirm that a Section 4407 D-2 easement for construction and operation of

the Shelter Cove Road would be issued for the State's road located anywhere within the

---

[39]     *Compare* SOA 34-4 (2008 reconnaissance map) with Exhibit B (2008 Forest Plan
Map).
[40]     SOA 53-2 (Map of D-1 easement route through Naha LUD II Management Area);
*See also* Public Law 101-626 § 201(11), 104 Stat. 429 (November 28, 1990) (establishing
Naha LUD II Management Area).
[41]     Docket 1 (Complaint) ¶ 56 and Docket 59 (Answer) ¶ 56.
[42]     AR 740_0281 (Ketchikan to Shelter Cove Road Reconnaissance Report (August
2012)).

*SOA v. USFS and David Schmid*                                    Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 13 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 18 of 43

square-mile section identified in the D-1 easement.[43]  In the lead up to the State's meeting with the Forest Service, internal Forest Service discussions also show their consistent understanding regarding the State's flexibility to locate a road anywhere within the mile-wide sections listed in the D-1 easement.[44]  The Forest Service also fully recognized that the State required a firm decision from the Forest Service, since private property had to be acquired by the State to re-route the Shelter Cove Road.[45]  With the Parties' agreement on the availability of the 4407 easement for the Shelter Cove Road traversing the low route, the Forest Service advised the State to submit its application for the D-2 easement.[46]

Through this time period the Parties also worked together to revise the Shelter Cove Road D-1 easement so that it showed the planning corridor turn southward through

---

[43]     AR 17 ("To be clear, a road and utility corridor with an approximate 300 foot wide easement can be located anywhere within those sections called out in the easement to best meet geometric, geophysical, cost, and environmental design considerations.").

[44]     *See e.g.*, AR 58 at 0266 ("When Ken prepared the Location Descriptions included in the [D-1] easements, he said he included all the sections for about a mile wide corridor … He's thinking the 'described herein' [in the D-1 easement] included all the sections described for planning and design, but the final width would be a 300 feet wide easement for construction.").

[45]     SOA 59 ("[J]ust wondering where you are at on the revised Shelter Cove Easement.  We are getting close to obtaining ROW for the White River Road from Cape Fox and Sealaska and are beginning to work with Mental Health Trust and DNR for ROW there."); *and* SOA 63 ("As the state is beginning to acquire other easements for the 'low-low' route they are looking for additional assurance that the FS will accept entry into Section 17. … Essentially they want to be sure that the FS will continue to hold the view that entry into section 17 is authorized under the 4407 planning easement, especially in light of their recent White River Road purchases.").

[46]     SOA 64 ("We reviewed the 4407 documents and believe it would be best for the state to request a construction (D-2) easement up front with your [the State's] initial submittal.  We'll adjust the easement to reflect final alignment at a later time.  A construction easement would certainly put an end to questions.").

*SOA v. USFS and David Schmid*                               Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 14 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 19 of 43

Sections 8 and 17, rather than the northward trajectory that was depicted in the original D-1 easement.[47]  The Forest Service fully recognized that the revised D-1 easement would authorize the State's more detailed environmental and engineering studies to complete the final design of the road following the low route.[48]  With the Parties complete understanding and agreement, the State moved forward to complete its engineering and environmental permitting for the Shelter Cove Road alignment following the low route.

## V.    Differing Assumptions and Interpretations of the 4407 MOU.

On December 23, 2013, the State requested the D-2 easement for a 300-foot-wide Shelter Cove Road alignment across Sections 8 and 17, which the Forest Service found sufficient to begin the processing the easement documentation.[49]  At that time, the Forest Service also maintained the shared understanding that issuance of the congressionally

---

[47]    SOA 69 ("The corrected draft easement is scheduled to be signed on Monday … I am enclosing the latest draft versions of the easement and map."); *and Compare* SOA 69-1 (Shelter Cove Road revised D-1 easement map) with SOA 45-2 at 0386 (Shelter Cove Road D-1 Easement Map).

[48]    SOA 68 at 0477 ("The 4407 easement (planning easement –D1) that covered the "blue cloud" area [the State's low route, see AR 62 at 000275] was amended/corrected last week … This means that all surveys you need to accomplish are approved under the planning easement … Looking forward, once the planning phase is accomplished through the D1 easement, the State will submit a draft design package for NFS lands.  Upon approval, a construction easement (D2) will be needed.").

[49]    *See respectively* AR 740_1450 (State's D-2 easement request) and AR 84 at 0315 ("The Tongass has reviewed the Shelter Cove Road proposed alignment both in the field and the paper plan submitted by Al Clough on December 23, 2013.  The alignment has been field verified to occur only within a small portion of the existing 4407 D1 easement (T.73 S, R.92 E, Sec 8 and 17).  The design documents provided are of sufficient detail to start the D2 easement process.").

*SOA v. USFS and David Schmid*                     Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 15 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 20 of 43

granted easement did not require a discretionary decision by the Forest Service and, thus, did not require a Forest Service NEPA decision.[50]

Shortly after the State submitted its request for the Shelter Cove Road D-2 easement, the Forest Service came to a new position.[51] On March 21, 2014, the Forest Service sent a letter informing the State of "differing assumptions and interpretations" of the 4407 MOU's framework and processes for issuing the congressionally granted easements.[52] In particular, the Forest Service interpreted the template D-1 easement to restrict the State's flexibility to adjust any road alignment more than 150 feet on either side of the unexamined and unsurveyed lines on the D-1 easement maps that visually depict the rough location and direction of each transportation and utility corridor.[53] Additionally, under the Forest Service's new interpretation Map 92337 would be interpreted to restrict the potential alignments of transportation and utility corridors, and

---

[50]     AR 76 ("Notwithstanding any other provision of law—don't have to comply with other laws that might apply—we have no discretion.").

[51]     AR 95 (February 14, 2014 Forest Service Alaska Region meeting notes) ("We need to draft a letter in response. Brief line officers. Originally no discretionary action so no NEPA but we have refined our position."); *but see* AR 155 at 740_000557 (March 14, 2014 Saddle Lakes Timber Sale meeting notes) ("The Forest Service is reviewing the [Section 4407 D-2 easement] ROW grant application from the State of Alaska now. … We don't need to include NEPA for an easement on this section of road right now.").

[52]     AR 21 at 0102.

[53]     AR 21 at 0102 ("[W]here National Forest System lands outside of the 300 feet provided in the D-1 easement are needed for planning purposes, that need may be accommodated through issuance of a special use permit."); *see also* AR 740_1448 at 049154 (Map of Shelter Cove Road right-of-way corridor attached to February 2009 D-1 easement).

*SOA v. USFS and David Schmid*                    Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 16 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 21 of 43

project locations not directly coinciding with Map 92337 (*e.g.*, traversing the Naha LUD II Management Area) would require a NEPA review and decision by the Forest Service.[54]

The Forest Service's reinterpretation of the 4407 MOU requirements resulted in open-ended delays in the issuance of 4407 easements for a number of highway project in southeast Alaska, which prompted a May 5, 2015 inquiry to the Chief of the Forest Service from Alaska's United States senators.[55]  Shortly thereafter, the Senate Committee on Environment and Public Works took up the issue of the new interpretations of Section 4407 for a possible amendment to the then-pending Federal-aid highway reauthorization bill, and accepted proposed amendments to Section 4407 from each of the Parties.[56] During the brief period that the committee considered potential amendments to Section 4407, the Forest Service issued three D-2 easements to the State: two that transferred responsibilities for forest highways improved with Federal-aid highway funds, and the third transferred responsibilities for the easternmost eight-mile section of the existing and unimproved Shelter Cove Road.[57]  The Forest Service unilaterally modified all three easements to include an additional sentence not found in the 4407 MOU pre-negotiated template D-2 easement's Paragraph 9: "Review of any plans for new, additional, or

---

[54]     AR 21 at 0103 ("In addition, there are issues about the Forest Service's authority to issue easements pursuant to the MOU where the alignment of an ADOT&PF project does not coincide with the rights-of-way identified in map number 92337, as well as issues regarding the analysis of environmental effects.").

[55]     SOA 100; *see also* Docket 1 (Complaint) ¶¶ 69-71 and Docket 59 (Answer) ¶¶ 69-71 for details of the delayed 4407 easements for other projects in southeast Alaska.

[56]     SOA 103 (Forest Service's June 16, 2015 proposed amendment) and SOA 104 (State's June 17, 2015 proposed amendment).

[57]     *See* Complaint ¶¶ 70-71 and Answer ¶¶ 70-71.

*SOA v. USFS and David Schmid*                                    Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 17 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 22 of 43

further earth disturbing activities for highway and utility projects within the easement area will be subject to appropriate compliance with the National Environmental Policy Act."[58]

On June 23, 2015, Senate Bill 1647 was approved by the committee, with an amendment to Section 4407 to strike the verb phrase "hereby enacted into law" and to insert the verb "granted."[59]  On July 15, 2015, the Senate committee published Report 114-90 describing the intended effect of the proposed amendment to SAFETEA-LU § 4407, which stated in part:

> SAFETEA-LU established reciprocal easements in section 4407 between the United States Forest Service and the State of Alaska.  The technical amendment to this section cures a perceived defect and now will allow the exchange of all remaining easements to continue.  As soon as possible, the Committee intends the Secretary of Agriculture (Secretary) to prepare and deliver to the State of Alaska an easement for the construction and operation of each highway located in a transportation and utility corridor identified on Map 92337 where the State of Alaska has already secured all necessary Federal and State permits for the construction of each highway facility.  …  The Committee intends that the Secretary of Agriculture will not withhold or deny the issuance of an easement for a proposed transportation or utility project that otherwise has all necessary construction permits and authorizations from other State and Federal agencies.[60]

---

[58]    AR 740_1449 at 049160 (D-2 easement for existing and unimproved Shelter Cove Road); *See also* SOA 114 at 0686 ("While I recognize the State may not agree, in my view compliance with applicable federal law must occur prior to any new, additional, or further ground disturbing activities proposed in future highway and utility projects within the D2 Easement right-of-way.  I have, therefore, added a sentence to paragraph 9 providing for appropriate compliance with NEPA in each of the three executed D2 Easements, which are enclosed.").

[59]    AR 185; 2015 CONG US HR 22, Section 14001(q) (HR 22 Engrossed Amendment Senate (July 31, 2015)).

[60]    SOA 101 at 0642-0643; 2015 WL 4384695 at *18-19.

*SOA v. USFS and David Schmid*                    Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT        Page 18 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 23 of 43

The amendment to SAFETEA-LU § 4407 from the Senate's Committee on Environment and Public Works remained intact through the remainder of the legislative process and is now law.[61]

Two days after the Senate committee approved the amendment to Section 4407, the State delivered a renewed request for the Shelter Cove Road D-2 easement to allow construction and operation in Sections 8 and 17.[62] The State's renewed request included documentation of all state and federal permits and authorizations necessary for construction, including documentation of the Corps' NEPA analysis and decision.[63] On July 16, 2015, just a single day after the Senate committee issued its report on the matter, the Forest Service denied the State's renewed request for the D-2 easement without any variance from its original and now debunked perception of immovable and extremely narrow limits on 4407 easements:

> [C]onsistent with my letter to Commissioners Joe Balash and Patrick Kemp, dated March 21, 2014, which addressed the Forest Service's authority to issue easements where the alignment of the State's Shelter Cove project does not coincide with the rights-of-way described in Section 4407 [assumed and interpreted as 300 feet wide]. It remains the position of the United States that a D-2 easement for the segment of road within Section 17 is not authorized under Section 4407.[64]

The State's Complaint seeks judicial review of the July 16, 2015 decision to deny the State's request for its D-2 easement, which was based upon the Forest Service's

---

[61]     SOA 102 at 0645; P.L. 114-94, 129 Stat. 1312, 1438 (December 4, 2015).
[62]     AR 31.
[63]     AR 31 at 740_000145; *See also* AR 168 (Shelter Cove Road environmental analysis and permit summary).
[64]     AR 32 at 740_000153.

*SOA v. USFS and David Schmid*                          Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 19 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 24 of 43

"differing assumptions and interpretations" articulated in the Forest Service's March 21, 2014 denial of the same easement.[65]

On April 20, 2018, the Forest Service issued the D-2 easement authorizing construction and operation of the State's Shelter Cove Road in Sections 8 and 17.[66] The Forest Service's action alleviated the State's need for injunctive relief; however, the Forest Service's cover letter delivering the D-2 easement evidences the continuing disputes between the Parties with regard to whether the lines depicted on the D-1 easement maps or on Map 92337 create fixed boundaries for the location of the State's infrastructure and whether the Forest Service retains discretion to withhold or issue a 4407 easement.[67] To resolve these continuing disputes, the State presents the following arguments and prays that the Court rules in its favor on the four causes of action for declaratory relief.

## STANDARD OF REVIEW

As a challenge to a final agency action, this action is reviewed on the basis of an agency record under the Administrative Procedure Act (APA) and resolution by motions for summary judgment is appropriate.[68] The role of the Court "is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to

---

[65]     Docket 1 (¶¶ 6, 79-80).
[66]     Docket 84-2.
[67]     Docket 84-1 ("[T]he Forest Service has determined that the State's alignment is within the Congressionally-designated easement area. Based on this assessment, we believe it is reasonable to issue the D2 easement.").
[68]     D.Ak L.R. 16.3(c)(2).

*SOA v. USFS and David Schmid*                    Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 20 of 38

make the decision it did."[69]  Under the APA, courts should "hold unlawful and set aside agency action, findings, or conclusions" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,"[70] or if adopted "without observance of procedure required by law."[71]  An agency's decision is arbitrary and capricious where it "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[72]

When reviewing an agency's decision, the court must ensure that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"[73]  The court should not attempt to make up for deficiencies: "We may not supply a reasoned basis for the agency's action that the agency itself has not given."[74]

Courts look particularly closely at agency reversals in policy.  While an agency can change course, when "its new policy rests upon factual findings that contradict those

---

[69]   *City & County of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997).
[70]   5 U.S.C. § 706(2)(A).
[71]   5 U.S.C. § 706(2)(D).
[72]   *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Ctr. for Biological Diversity v. Nat'l Highway Transp. Safety Auth.*, 538 F.3d 1172, 1193 (9th Cir. 2008) (explaining that a decision is arbitrary if it is not supported by the record).
[73]   *Motor Vehicle*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).
[74]   *Motor Vehicle*, 463 U.S. at 43 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

*SOA v. USFS and David Schmid*                                    Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 21 of 38

which underlay its prior policy," the agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate."[75]  A policy change violates the APA if the agency "ignores or countermands its earlier factual findings without reasoned explanation for doing so."[76]

## ARGUMENTS

### I.    Interpretation of Fixed Easement is Arbitrary and Capricious (1st COA).

The Forest Service's differing assumption and interpretation of the 4407 easements is entirely rooted in their assertion that the lines depicting proposed transportation and utility corridors, which were drawn by the Parties in the nascent stages of the easement exchange, should be treated as permanent and unamendable property descriptions.  If the highway or utility infrastructure cannot be built within the confines of the Forest Service's restrictive path, the Forest Service determines that the congressionally established 4407 easement fails.  Originally, the Forest Service refused to issue the D-2 easement for any State project located outside an immovable 300-foot-wide corridor, which was based on the map attached to each D-1 easement to depict the

---

[75]     *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009); *see also Atchison, Topeka & Santa Fe Ry. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973) (plurality opinion) ("Whatever the ground for the [agency's] departure from prior norms, . . . it must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate."); *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687-88 (9th Cir. 2007) ("[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute" (citation omitted)).

[76]     *Organized Vill. of Kake*, 795 F.3d at 966 (internal quotation and citation omitted).

*SOA v. USFS and David Schmid*                                    Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 22 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 27 of 43

general direction and location of the planning corridor.[77]  When the Forest Service finally issued the D-2 easement for the Shelter Cove Road project, it based its approval upon a determination that the road alignment is located within a fixed "Congressionally-designated easement area" depicted on Map 92337.[78]  In each of these instances, the Forest Service's decision is arbitrary and capricious as the maps do not set fixed and unalterable easement boundaries.  There is no support for the Forest Service's interpretation of fixed boundaries in the Parties' development of the ratified easement exchange, nor in the 4407 MOU documents, nor in the governing case law.

A familiar canon of construction states that issues arising with grants of federal lands "are resolved for the Government not against it."[79]  However, this well-settled rule has an exception that is fully applicable to the facts in this case: "[P]ublic grants are construed strictly against the grantees, but they are not to be so construed as to defeat the intent of the legislature, or to withhold what is given either expressly or by necessary or fair implication."[80]  The exception for more liberal construction of federal grants was developed in the context of the expansion of railroad infrastructure across the American

---

[77]     AR 21 at 0102 ("[W]here National Forest System lands outside of the 300 feet provided in the D-1 easement are needed for planning purposes, that need may be accommodated through issuance of a special use permit.").

[78]     Docket 84-1 at 1 ("[T]he Forest Service has determined that the State's alignment is within the Congressionally-designated easement area.  Based on this assessment, we believe it is reasonable to issue the D2 easement").

[79]     *Leo Sheep Co., v. United States*, 440 U.S. 668, 683-684, 99 S.Ct. 1403, 1411 (1979) (quoting, *Andrus v. Charlestone Stone Products Co.*, 436 U.S. 604, 98 S.Ct. 2002, 2010 (1978)).

[80]     *Id.* (quoting, *United States v. Denver & Rio Grande R. Co.*, 150 U.S. 1, 14, 14 S.Ct. 11, 15-16 (1893)).

*SOA v. USFS and David Schmid*                          Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 23 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 28 of 43

west, and the rationale for the exception perfectly applies to the expansion of transportation and utility infrastructure across the underdeveloped public lands of southeast Alaska. As explained by the Supreme Court in the context of railroad expansion: "When an act, operating as a general law, and manifesting clearly the intent of Congress to secure public advantages … offers to individuals or corporations as an inducement to undertake and accomplish great and expensive enterprises or works of quasi public character in or through an immense and undeveloped public domain, such legislation stands upon a somewhat different footing from merely a private grant, and should receive at the hands of the court a more liberal construction in favor of the purposes for which it was enacted."[81] Clearly, the development of overland transportation and utility infrastructure to connect the isolated communities throughout the Tongass National Forest serves a tremendous public good and the congressionally granted easements are entitled to sufficient latitude from federal land managers to accomplish the purposes for which they were created.

The defining feature of a road or a utility is that the infrastructure connects two definite points.[82] A road or utility that nearly connects two communities cannot begin to serve its intended purpose until the connection between the communities is fully

---

[81]     *Id.*

[82]     *Dillingham Commercial Co., Inc. v. City of Dillingham*, 705 P.2d 410, 414 (Alaska 1985) ("[A] right-of-way created by public user pursuant to 43 U.S.C. § 932 [R.S. 2477, now repealed] connotes definite termini"); *See also Shultz v. Department of Army*, 10 F.3d 649, 655 (9th Cir. 1993) ("We conclude that as long as the termini of the right of way are fixed … to establish public right of way the route in between need not be absolutely fixed.") opinion withdrawn by *Shultz v. Department of Army*, 96 F.3d 1222 (9th Cir. 1996).

*SOA v. USFS and David Schmid*                                        Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 24 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 29 of 43

completed. Even a cursory view of Map 92337 reveals the defining feature of the depicted transportation and utility corridors: they connect the communities of southeast Alaska to each other and to the North American highway system.[83] The yellow lines depicting the connecting infrastructure are labeled in the map's legend as "Proposed Transportation and Utility Corridors," which clearly indicates that the yellow lines are suggested or possible locations for the transportation and utility infrastructure.[84] Likewise, the map of reciprocal easements developed by the Parties and presented to Congress plainly states that "Boundaries and locations are approximate. This map should not be used or interpreted for legal or administrative actions."[85] There is just no indication on Map 92337 that the Parties or Congress intended to restrict the connecting infrastructure to any specific location.

The Parties' original draft legislation clearly intended that the transportation and utility easements received by the State would be consistent with the standard easements granted for federal-aid highway projects.[86] One of the most basic right-of-way requirements for a federal-aid project is that the highway must make a useable connection

---

[83]    AR 178.

[84]    AR 178.

[85]    AR 176.

[86]    SOA 105 at 0651 § 1(b) ("Said easements shall be in the form and style currently used by the United States Department of Transportation to States for Highway purposes, containing no additional constraints or restrictions from those issued to other States for the purpose of permitting public highways and roads"); *See also* AR 1 at 740_000003 (4407 MOU ¶ D(4): "The easements in paragraph D.2 shall be sufficient to satisfy the requirements of 23 C.F.R. § 1.23 [federal-aid highway rights-of-way] for the construction, operation, and maintenance of roads, utilities, and other linear transportation and utility purposes").

*SOA v. USFS and David Schmid*          Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT    Page 25 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 30 of 43

to a logical destination that would justify the expenditure of public funds.[87]  Federal laws include no location restrictions for federal highway easements to connect the logical termini, as long as the requested federal property is "reasonably necessary for the right-of-way of any highway."[88]  Whether specific federal land is 'reasonably necessary' for a highway project is demonstrated with a right-of-way map of the highway alignment that has received its state and federal environmental permits authorizing construction.[89]  Just like the standard easements for federal-aid highway projects, there are no location restrictions for the Forest Service's issuance of a D-2 easement for any fully permitted highway alignment.[90]

Section 4407 does not impose highway location restrictions.  The Forest Service's 2009 issuance of the D-1 easement for a highway corridor that varied from the 'proposed corridor' depicted in Map 92337 was fully consistent with Section 4407 and the 4407

---

[87]     23 U.S.C. § 139 ("(e) <u>Project initiation</u> … (1) The project sponsor shall notify the Secretary [of Transportation] of the type of work, termini, length and general location of the proposed project"); 23 C.F.R. § 771.111(f) ("[The proposed project] shall: (1) Connect logical termini and be of sufficient length to address environmental matters on a broad scope; [and] (2) Have independent utility or independent significance, i.e., be useable and be a reasonable expenditure even if no additional transportation improvements in the area are made").

[88]     23 U.S.C. § 317(a).

[89]     *Id.* ("[T]he Secretary [of Transportation] shall file with the Secretary of the Department supervising the administration of such lands or interests in lands a map showing the portion of such lands or interests in lands which it is desired to appropriate.").

[90]     *See* Senate Committee Report 114-80, SOA 101 at 0642 ("[T]he Committee intends the Secretary of Agriculture (Secretary) to prepare and deliver to the State of Alaska an easement for the construction and operation of each highway located in a transportation and utility corridor identified on Map 92337 where the State of Alaska has already secured all necessary Federal and State permits for construction of each highway facility.").

*SOA v. USFS and David Schmid*                              Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 26 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 31 of 43

MOU.[91]  The route chosen by the Parties in 2009 for a potential alignment connecting

Ketchikan to Shelter Cove was based on the best information the Parties had at that time,

which was information unavailable to them in 2004 when Map 92337 was drawn.[92]  The

Forest Service's issuance of a revised Shelter Cove Road D-1 easement in 2014 to depict

the highway planning corridor changing course southward through Sections 8 and 17,

was likewise based upon more detailed information and was perfectly consistent with the

design flexibility intended by the Parties and allowed under Section 4407.  Because

Section 4407 and its Map 92337 do not set defined boundaries or location restrictions for

either the State's transportation and utility infrastructure, the Parties' choice of a D-1

easement planning corridor in 2009 and the Parties' revision of the D-1 easement in 2014

to further the study and development of the low route were both consistent with Section

4407 and the 4407 MOU.

Therefore, the Forest Service's creation and enforcement of a location restriction

in its March 21, 2014 decision to deny the State's request for its D-2 easement was

arbitrary, capricious and contrary to Section 4407 and the Parties' agreed upon process

for issuing D-2 easements under the 4407 MOU.[93]  Equally offensive is the location

restriction introduced by the Forest Service in its decision to issue the D-2 easement.[94]

---

[91]     *Supra.*, at 10-12 (Statement of Facts Section III).
[92]     *Supra.*, at 12-14 (Statement of Facts Section IV).
[93]     AR 21 at 0102 ("[W]here National Forest System lands outside of the 300 feet
provided in D-1 easement are needed for planning purposes, that need may be
accommodated through issuance of a special use permit.").
[94]     Docket 84-1 at 1 ("[T]he Forest Service has determined that the State's alignment
is within the Congressionally-designated area.").

*SOA v. USFS and David Schmid*                    Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 27 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 32 of 43

The Forest Service's location restrictions were wholly created by new assumptions and interpretations of Section 4407 and the 4407 MOU, the basis of which have heretofore not been disclosed or explained to the State. Whatever the rationale for the differing assumptions and interpretations, the Forest Service is prohibited from construing Section 4407 "as to defeat the intention of the legislature, or to withhold what is given either expressly or by necessary or fair implication."[95] The State bargained for and was granted highway and utility easements to connect the communities of southeast Alaska to each other and to the North American highway system. The purpose of the grant is served only upon the connection of two logical destinations in a continuous corridor to connect the southeast Alaska communities; the purpose of the grant is defeated if a connection between southeast Alaska communities is severed by the withholding of a 4407 easement for any segment of a proposed transportation and utility corridor depicted on Map 92337.

To fulfill the purposes of Section 4407 and the Parties' 4407 MOU, the Court should grant the State's second and third prayers for relief by issuing a judgment declaring that: 1) the 300-foot-wide planning easement is not fixed at any particular location, but may float within the square-mile sections identified in each D-1 easement; and 2) the D-1 easements may be amended, without location restrictions, to accommodate the environmental permitting and development of a transportation or utility facility connecting the communities of southeast Alaska.

---

[95]    *Leo Sheep Co. v. U.S.*, 99 S.Ct. at 1411, 440 U.S. at 682-83.

*SOA v. USFS and David Schmid*                                    Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 28 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 33 of 43

## II.     Interpretation of Discretionary Decision is Arbitrary and Capricious (2nd COA).

Congress's ratification of the Parties' reciprocal easement exchange, depicted on Map 92337, granted to the State transportation easements connecting each major community in Southeast Alaska; the ratification also authorized the Forest Service's receipt of State granted easements that expanded the perimeter of the Tongass National Forest by securing federal access over adjacent state-owned submerged lands. Congress's grant of transportation and utility easements to the State was immediate upon enactment.[96] The congressional grant was also understood by the Parties to create a present property interest in those transportation and utility easements.[97] The 4407 MOU provides a framework and process for the Parties to cooperatively seek a location minimizing the environmental footprint while controlling public costs; however, the 4407 MOU certainly does not provide the Forest Service with any discretion to frustrate the purposes of the easement exchange by withholding or denying an 4407 easement for a transportation project to connect the communities of southeast Alaska.[98]

---

[96]     3A Sutherland Statutory Construction § 64:7 (2011)("Grants of land by the government are effected by means of enactments which constitute laws as well as contracts").

[97]     AR 1 at 0010 (4407 MOU, D-1 easement form)("WHEREAS, pursuant to Section 4407 of Public Law 109-59, the United States Congress has directed that the reciprocal rights-of-way and easements identified on a map numbered 92337 be enacted and thereby granted between the United States and the State of Alaska")(emphasis added); *See also* AR 1 at 0013 (4407 MOU, D-2 easement form)(same).

[98]     AR 1 at 0001 ("The purpose of this MOU is to establish a framework and process for granting the reciprocal rights-of-way and easements described in Section 4407 of Public Law 109-59").

*SOA v. USFS and David Schmid*                          Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 29 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 34 of 43

The Forest Service claims discretionary power to withhold or deny a 4407 easement, premised on its March 21, 2014 interpretation of plenary authority to determine whether a project is located within a boundary fixed by Map 92337.[99]  As fully explained above, neither Section 4407 nor the 4407 MOU set fixed boundaries for the reciprocal easements; thus, the Forest Service's interpretation is not entitled to deference.[100]  The Forest Service's unilateral claim of discretionary power was used four years after their original decision to reach the opposite conclusion on the State's Shelter Cove Road alignment.[101]  However, it was Congress that granted the easements to fully connect the communities of southeast Alaska, giving the State a possessory interest in those transportation and utility easements.  Therefore, the Forest Service has no discretion to withhold or deny a 4407 easement.[102]

It is somewhat surprising that the Forest Service continues to claim discretionary authority to withhold the easements, when they now concede that the 4407 easements are

---

[99]     AR 21 at 0103 (March 21, 2014 decision)("[T]here are issues about the Forest Service's authority to issue easements pursuant to the MOU where the alignment of an ADOT&PF project does not coincide with the rights-of-way identified on Map 92337").
[100]    *Racine v. United States*, 858 F.2d 506, 508 (9th Cir. 1988) ("The Secretary's interpretation of the easement is not entitled to deference because it did not involve an interpretation of a statute or regulation.").
[101]    Docket 84-1 at 1 (April 20, 2018 decision)("Considering the potential sources of error for the mapping processes and products, that is, the scale and nature of the Map 92337 and data, the Forest Service has determined the State's alignment is within the Congressionally-designated easement area.").
[102]    SOA 101 at 0643 ("The Committee intends that the Secretary of Agriculture will not withhold or deny the issuance of an easement for a proposed transportation or utility project that otherwise has all necessary construction permits and authorizations from other State and Federal agencies.").

*SOA v. USFS and David Schmid*                    Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 30 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 35 of 43

*in praesenti* grants.[103]  It was Congress's creation of a present property interest for the State—the *in praesenti* grant—that eliminated any potential Forest Service discretion to withhold or deny the easement.[104]  Congress's establishment of the Section 4407 transportation and utility easements was not operably different from Congress's establishment of rights-of-way over federal lands to railroad companies.[105]  In those acts, railroad companies were granted rights-of-way over federal lands to locate railroad beds and, upon the Secretary of the Interior's approval of the surveyed location of the roadbed, a 200-foot-wide easement was issued prior to construction of the railroad.[106] The uniform rule developed in cases examining the railroad acts is: When rights-of-way are granted over federal lands by operation of statute, the congressional act is "a grant *in praesenti* of lands to be thereafter identified."[107]  The recipient of the statutory grant "can only be deprived [of its granted property rights] by a proceeding taken directly for that purpose."[108]  Since Section 4407 enacted transportation easements across federal lands to connect isolated towns and cities—similar to the railroad acts that came before it—the

---

[103]     Docket 84-1 at 1 ("When Congress amended the language of section 4407 in 2015, changing the words 'hereby enacted into law' to 'granted', the rights of way and easements across National Forest System lands became *in praesenti* grants").

[104] SOA 101 at 0642 (Senate Report 1647)("The technical amendment to this section [4407] cures a perceived defect and now will allow the exchange of all remaining reciprocal easements to continue.").

[105]     Concise histories of the congressional acts granting property rights to railroad companies can be found in *Marvin M. Brandt Revocable Trust v. United States*, 527 U.S. 93, 96-98, 134 S.Ct. 1257, 1260-1262 (2014) and *Great Northern Ry. Co. v. United States*, 315 U.S. 262, 274-275, 62 S.Ct. 529, 533-535 (1942).

[106]     *See e.g.*, 43 U.S.C. §§ 934-937.

[107]     *Noble v. Union River Logging R. Co.*, 147 U.S. 165, 176, 13 S.Ct. 271, 274 (1893).

[108]     *Id.*

*SOA v. USFS and David Schmid*                          Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 31 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 36 of 43

Forest Service retains no discretion to withhold or deny an easement for an alignment depicted on a survey that has all environmental permits necessary for construction.[109]

A road construction project can only be permitted on an alignment in the specific location found to be the least environmentally damaging practicable alternative (commonly known as LEDPA).[110] The LEDPA requirement is considered the "steepest hurdle" in environmental permitting.[111] In order to use its transportation easement rights through the Tongass National Forest, the State must build its facility in the 300-foot-wide path along the LEDPA alignment; a 300-foot-wide path in some other location would, by definition, be more environmentally damaging and could not be permitted. There is nothing in Section 4407 or the 4407 MOU that gives the Forest Service the discretionary authority to deny the State's request for an easement along the LEDPA alignment. Thus, the Forest Service acts arbitrarily and capriciously when exercising claimed discretion to restrict a 4407 easement to any alignment fixed by the lines used in Map 92337 (unless that location was coincidentally the LEDPA location) as the Forest Service's improper

---

[109]   AR 1 at 0002 (4407 MOU ¶ (D)(1): "The location of the right-of-way will be further detailed by a survey diagram or diagrams at times and places mutually agreed by the parties and such survey diagram will be prepared during the course of [engineered design and environmental review] activities described above, but prior to construction (*see* D.2.).").

[110]   40 C.F.R. § 230.10(a) ("[N]o discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem").

[111]   Shutz, J. (2005). *The Steepest Hurdle in Obtaining a Clean Water Act Section 404 Permit: Complying with EPA's 404(b)(1) Guidelines' Least Environmentally Damaging Practicable Alternative Requirement*, 24 UCLA J. Envtl. L. & Pol'y 1. Retrieved from https://escholarship.org/uc/item/2976c9tq.

*SOA v. USFS and David Schmid*                    Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 32 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 37 of 43

exercise of discretion would deny the State's right to reasonable use and enjoyment of its congressionally granted 4407 easement.[112]

For these reasons, the Court should grant the State's third prayer for relief by issuing a judgment declaring that the Forest Service has no discretion to withhold or deny a D-2 easement for any project meant to connect the communities of southeast Alaska along the corridors depicted on Map 92337 that has all necessary permits for construction.

## III. Adding NEPA Requirement to D-2 Easement is Contrary to Law (3rd COA).

In its decision to deny the D-2 easement for the Shelter Cove Road project, the Forest Service opined that it may have to conduct an analysis of environmental effects "where the alignment of an ADOT&PF project does not coincide with the rights-of-way identified in map number 92337."[113] In the Forest Service's more recent decision to issue the D-2 easement for the project, however, they concede that Congress's "*in praesenti* grants mak[e] the issuance of the easement by the Forest Service an act that does not require an analysis under NEPA."[114] Unarguably, when Congress enacted the reciprocal easements into law "notwithstanding any other provision of law" they exempted the Forest Service's implementation of the 4407 MOU from the requirements of any federal

---

[112]     *Montana Wilderness Ass'n v. U.S. Forest Service*, 496 F.Supp. 880 (D. Mont. 1980) ("The United States, as the holder of the servient tenement, has the right to limit the location and use of Burlington Northern's easement of access, to that which is necessary for Burlington Northern's reasonable enjoyment of that right."), affirmed by *Montana Wilderness Ass'n v. U.S. Forest Service*, 655 F.2d 951 (9th Cir. 1981).
[113]     AR 21 at 0103 (March 21, 2014 Forest Service decision).
[114]     Docket 84-1 at 1 (April 20, 2018 Forest Service decision).

*SOA v. USFS and David Schmid*                                  Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 33 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 38 of 43

environmental statutes.[115]  It is for this same exact reason that the Forest Service did not

perform NEPA analyses when it followed the 4407 MOU processes to ultimately accept

its 4407 easements from the State of Alaska.[116]

The Court should take particular notice that the Forest Service's recent concession

on the applicability of NEPA is extremely narrow, in that they state "<u>the issuance of the

easement</u> by the Forest Service [is] an act that does not require an analysis under

NEPA."[117]  In 2015 the Forest Service adopted a position contrary to Section 4407's

'notwithstanding to any other provision of law' phrase and declared that any ground

disturbing construction or maintenance activities within the 300-foot-wide D-2 easement

area will be subject to a Forest Service discretionary authorization and a Forest Service

NEPA decision.[118]  The Forest Service implemented that decision by unilaterally

modifying three withheld D-2 easements to include a requirement for a Forest Service

NEPA decision.[119]  Concurrent with the issuance of the three modified easements, the

---

[115]    *Oregon Natural Resources Council v. Thomas*, 92 F.3d 792, 795-796 (9th Cir.
1996)("The effect of [the notwithstanding provision], therefore, is to render sufficient
under the environmental laws whatever documents and procedures, if any, the agency
elects to use.").
[116]    Complaint ¶ 28 and Answer ¶ 28.
[117]    Docket 84-1 at 1 (emphasis added).
[118]    SOA 114 at 0686 (June 12, 2015 Forest Service decision) ("[C]ompliance with
applicable federal law must occur prior to any new, additional, or further ground
disturbing activities proposed in future highway and utility projects within the D2
Easement right-of-way.  I have, therefore, added a sentence to paragraph 9 providing for
appropriate compliance with NEPA in each of the three executed D2 Easements, which
are enclosed.").
[119]    *See e.g*., AR 740_1449 at 049160 (June 12, 2015 D-2 easement for existing
Shelter Cove Road, ¶ 9: "Review of any plans for new, additional, or further earth
disturbing activities proposed for highway and utility projects within the easement area
will be subject to appropriate compliance with the National Environmental Policy Act.").

*SOA v. USFS and David Schmid*                                    Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 34 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 39 of 43

Forest Service drafted a proposed amendment to Section 4407 that would have formally given the Forest Service discretionary authority to review and approve any "proposal by the State of Alaska to carry out any earth disturbing activity within a right of way or easement that has been granted by this Section [4407]."[120] The Senate's Committee on Environment and Public Works did not pass the Forest Service's proposed amendment.[121] More pointedly, the Committee addressed the Forest Service's claim to NEPA decision making authority by issuing clear instructions that the Forest Service may be a cooperating agency in the environmental analysis and permitting of a State highway project, but the Forest Service has absolutely no authority to slow or stop a State project that has "all necessary construction permits and authorizations from other State and Federal agencies."[122] Clearly, Congress did not agree with the Forest Service's perceived authority to review and issue NEPA decisions on the State's ground disturbing activities within the 4407 easements.

The most surprising part of the Forest Service's recent claim of authority to issue a NEPA decision on the State's proposed construction or maintenance activities is that this issue was squarely addressed in the drafting of the 4407 MOU. In 2006, when the Parties were drafting Paragraph 9 of the form D-2 easement—the same paragraph unilaterally

---

[120] AR 196 (Forest Service Alaska Region proposed Section 4407 amendment); *See also* SOA 103 (June 16, 2015 USDA Section 4407 amendment proposal: "The intent of the amendment is to: Make clear that the "Notwithstanding any other provision of law" phrase in section 4407 applies only to the granting of an easement").

[121] 2015 CONG US HR 22, Section 14001(q) (HR 22 Engrossed Amendment Senate (July 31, 2015)).

[122] SOA 101 at 0642-0643 (Senate Report 114-80 to accompany S. 1647)(emphasis added).

*SOA v. USFS and David Schmid*          Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 35 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 40 of 43

modified by the Forest Service in 2015—the Forest Service recognized that it had no discretionary decision making power over the State's development activities within the easement boundaries since the 4407 highway easements were to be equivalent to the exclusive use easements granted to the State for federal-aid highway projects.[123]  The Forest Service deleted the provisions in Paragraph 9 that would have allowed the Forest Service to review potential effects of implementation of the State's planned work <u>inside the easement area</u>; after the Forest Service's deletion, Paragraph 9 only retained those provisions allowing the Forest Service to review the State's plans relative to potential effects <u>outside the easement area</u> upon National Forest System lands and resources.[124] This edit furthered the Parties' intent to make the easements "in the form of a standard FHWA highway easement, minus any requirements about [Forest Service] environmental review."[125]  The edit also recognized one of the essential requirements of an easement for a federal-aid highway project: there can be no shared management of the right-of-way as the State must maintain exclusive control over all real property within the right-of-way boundaries.[126]

---

[123]     SOA 18 at 0144 ("In ¶ 9, we had been tweaking the language quite a bit because of the State's concerns about FS's discretion. However, it occurred to me that the original language is appropriate, as it is the language in the standard USDOT easement that the State normally receives.").

[124]     SOA 18-1 at 0149.

[125]     SOA 109.

[126]     23 C.F.R § 1.23(b)("[A]ll real property, including air space, within the right-of-way boundaries of a project shall be devoted exclusively to public highway purposes. … The State highway department shall be responsible for preserving such right-of-way free of all public and private installations, facilities, or encroachments"); *See also* 23 C.F.R. § 710.403 (The grantee [State] must ensure that all real property interests within the

*SOA v. USFS and David Schmid*                                  Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 36 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 41 of 43

Section 4407 is quite clear that the easements were granted "notwithstanding any other provision of law." The Parties' drafting intentions and the 4407 MOU are also clear that D-2 easements are managed and controlled exclusively by the State. The legislative history for the clarifying amendment to Section 4407 is also clear that the State's construction activities must only be permitted by state and federal agencies other than the Forest Service. Therefore, the Court should grant the State's fourth prayer for relief by issuing a judgment declaring that the Forest Service's addition of a NEPA requirement to the D-2 easements was contrary to law as the Forest Service has no environmental permitting or NEPA decision making authority relative to the State's ground disturbing activities within the 4407 easement area.

## IV.  Decision to Deny D-2 easement was Arbitrary and Capricious (4th COA).

The Forest Service's April 20, 2018 issuance of the D-2 easement for the Shelter Cove Road project obviated the need for the State's fifth prayer for relief: a judgment compelling the Forest Service to issue the easement. Since the State is no longer seeking injunctive relief in this matter, there is no longer a reason to more particularly explore the Forest Service's March 21, 2014 decision to deny the D-2 easement for the Shelter Cove Road project.

## CONCLUSION

Congress granted to the State transportation and utility easements over federal lands, which are 300 feet wide whether they are located in one place or another. The

---

approved ROW limits … are devoted exclusively to the purposes of that facility and the facility is free of all other public or private alternative uses").

*SOA v. USFS and David Schmid*  Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT  Page 37 of 38
Case 1:16-cv-00018-RRB  Document 105  Filed 11/09/18  Page 42 of 43

Parties drafted the 4407 MOU to provide a two-step process, with the D1 and D2 easements, to locate the State's infrastructure in the best location while satisfying all environmental permitting requirements from other regulatory agencies. The Forest Service's late coming and unilaterally applied geographic restrictions and NEPA requirements were solely intended to frustrate the delivery of the congressionally granted easements to the State. For this reason, and based on the foregoing facts and authorities, the Court should issue the declaratory judgment requested by the State to allow the unimpeded development of infrastructure to connect the communities of southeast Alaska.

Respectfully submitted this 9th day of November, 2018.


JAHNA LINDEMUTH
ATTORNEY GENERAL


By:     /s/ Sean P. Lynch
        Sean P. Lynch
        Assistant Attorney General
        Alaska Bar. No. 0710065


**CERTIFICATE OF SERVICE**

I hereby certify that on November 9, 2018, a true and correct copy of the foregoing was served via the Court's ECF electronic service system on the following:

Dean K. Dunsmore

/s/ Harry Hale
Harry Hale, Law Office Assistant

*SOA v. USFS and David Schmid*                    Case No.: 1:16-CV-00018 (RRB)
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          Page 38 of 38
Case 1:16-cv-00018-RRB   Document 105   Filed 11/09/18   Page 43 of 43